UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------- x

STATE FARM MUTUAL AUTOMOBILE            :
INSURANCE COMPANY and STATE             :
FARM FIRE AND CASUALTY COMPANY,         :
                                        :
            Plaintiffs,                  :
                                        :
        -against-                        :        **REPORT AND**
                                        :        **RECOMMENDATION**
LEXINGTON MEDICAL DIAGNOSTIC            :        18-CV-03312 (DLI)(PK)
SERVICES P.C., LN MEDICAL               :
DIAGNOSTIC P.C., ELSANAA PT P.C.,       :
HAND BY HAND PT P.C., LESTER            :
NADEL, M.D., SONIA ARMENGOL, M.D.,      :
MAHMOUD ELSAYED ELSANAA, P.T.,          :
and JOHN DOE DEFENDANTS 1-10,           :
                                        :
            Defendants.                  :

-------------------------------------------------------- x

**Peggy Kuo, United States Magistrate Judge:**

On June 6, 2018, Plaintiffs State Farm Mutual Automobile Insurance Company and State Farm Fire and Casualty Company (collectively, "Plaintiffs") brought this action against Lexington Medical Diagnostic Services P.C., LN Medical Diagnostic P.C., Elsanna PT P.C., Hand by Hand PT P.C., Lester Nadel, M.D., Sonia Armengol, M.D., Mahmoud Elsayed Elsanna, P.T., and John Doe Defendants 1-10 (collectively, "Defendants"). ("Complaint," Dkt. 1.)

Before the undersigned on referral from the Honorable Dora L. Irizarry is Plaintiffs' Motion for Default Judgment against Lester Nadel, M.D., Lexington Medical Diagnostic Services P.C., and LN Medical Diagnostics P.C. (collectively, the "Defaulting Defendants"). ("Motion," Dkt. 61; Dec. 19, 2019 Dkt. Order.) For the reasons stated herein, the undersigned respectfully recommends that the Motion be granted in part and denied in part.

## FACTUAL BACKGROUND

Unless otherwise noted, the following facts are taken from the Complaint.

Plaintiffs are two Illinois-based automobile insurance companies that underwrite insurance policies in New York. (Compl. ¶¶ 9, 22.) Pursuant to New York's Comprehensive Motor Vehicle Insurance Reparations Act, N.Y. Ins. Law §§ 5101, *et seq.*, and the regulations promulgated pursuant thereto, 11 N.Y.C.R.R. §§ 65, *et seq.* (the "No-Fault Laws"), Plaintiffs provide to their insured customers no-fault benefits for personal injuries up to $50,000 per person. *See Allstate Ins. Co. v. A & F Med. P.C.*, No. 14-CV-6756 (ENV) (RLM), 2019 WL 7842516, at *1 (E.D.N.Y. Sept. 11, 2019), *R&R adopted*, 2020 WL 132387 (E.D.N.Y. Jan. 13, 2020). (*See also* Compl. ¶ 23-36.) Insured individuals may assign their rights to these benefits to healthcare providers in exchange for healthcare services. These assignments allow the providers to receive payment from the insurance company directly. *See* 11 N.Y.C.R.R. § 65-3.11. (*See also* Compl. ¶ 25.)

Nadel is a U.S. citizen who has resided in Montreal, Canada since June 2014. (*Id.* ¶¶ 12, 47.) He obtained his medical license in New York on July 1, 1975, and, in May 2015, he incorporated Lexington Medical Diagnostic Services P.C. ("Lexington"). (*Id.* ¶¶ 12, 47.) Ostensibly, Lexington provided medical services to automobile accident victims, and Nadel was its sole shareholder, director, and officer. In reality, and with Nadel's approval, Lexington was controlled by a group of individuals who did not have medical licenses (the "Layperson Controllers").[1] These individuals were Lexington's true owners, and they used Lexington to submit to Plaintiffs bills for no-fault medical expenses that were "medically unnecessary, illusory, or otherwise non-reimburseable." (*Id.* ¶¶ 1, 10, 47, 61.)

Lexington ceased operating in approximately June 2016. (*Id.* ¶ 49.) Around the same time, Nadel incorporated another New York-based company, LN Medical Diagnostic P.C. ("LN"). (*Id.* ¶¶ 11, 51.) LN was a front company like Lexington. Nadel was LN's sole shareholder, director, and

---

[1] The Layperson Controllers were the John Doe Defendants. (Compl. ¶ 3(v).)

officer, but the company was also run and beneficially owned by the Layperson Controllers who, with Nadel's approval, submitted to Plaintiffs bills for no-fault medical expenses that LN did not provide and/or were not medically necessary. (*Id.* ¶¶ 1, 51, 61.) LN stopped operating after a few months, in September 2016. (*Id.* ¶ 52.)

According to Plaintiffs, the Defaulting Defendants submitted documentation—including NF-3 forms, which are the "statutorily prescribed claim forms for [n]o-[f]ault benefits"—that were "false and misleading." (*Id.* ¶¶ 203-04.) For example, the Defaulting Defendants represented "[t]hrough this documentation" that they performed "medically necessary" procedures. (*Id.* ¶ 204(i).) "In fact," the procedures "were not medically necessary but [were] provided [ ] pursuant to a pre-determined protocol and financial and referral relationships that financially enriched the Defendants, rather than legitimately treating or otherwise benefiting the" patients. (*Id.*) "The charges reflected in the documentation also submitted by or on behalf of the [Defaulting] Defendants misrepresented and/or exaggerated the scope and/or level of services that purportedly were provided." (*Id.* ¶ 204(ii).) This documentation wrongly represented that the Defaulting Defendants "were in compliance with all material licensing laws, and therefore, eligible to receive" benefits pursuant to the No-Fault Laws. (*Id.* ¶ 204(iii).) "In fact, [Lexington and LN] operated in violation of material licensing laws" because they were run by the Layperson Controllers and they "engag[ed] in improper financial and referral arrangements." (*Id.*) The documentation submitted by the Defaulting Defendants additionally represented that they could receive certain benefits pursuant to New York's Insurance Law that they were actually ineligible to receive because their medical "services were provided by independent contractors." (*Id.* ¶ 204(iv).)

Nadel and the Layperson Controllers took steps to create the inaccurate impression that Lexington and LN were legitimate medical practices. For example, the Layperson Controllers rented private mailboxes for Lexington and LN, and they submitted bills to Plaintiffs that used the mailboxes'

addresses as the companies' billing addresses, falsely creating the impression that Lexington and LN "were legitimate places of business." (*Id.* ¶ 66.) According to Plaintiffs, "Lexington initially listed its address on its bills . . . as 2754 Coney Island Avenue, Suite 039, Brooklyn, New York 11235. In reality, Lexington maintained no physical presence at this address, as that location is a 'Western Union' store. The 'Suite 039' number used by Lexington referred instead to a mailbox number at the location." (*Id.* ¶ 67.) Subsequently, Lexington sent correspondence to Plaintiffs claiming that it was moving to a new location on East 21st Street in Brooklyn. This address, too, was a mailbox, this time at a store called "Mailboxes of Brooklyn." (*Id.* ¶ 68.) The Layperson Controllers and Nadel also used the East 21st Street address as LN's billing address, and listed it on LN's certificate of incorporation as the address for serving process on LN and as Nadel's residence. (*Id.* ¶ 69.) It was used as Nadel's address "so that [he] would appear on paper as living in New York, when, in fact, Nadel has lived in Montreal, Quebec, Canada at the time LN was incorporated and throughout the entire duration of the fraudulent scheme." (*Id.*)

The Layperson Controllers had a stamp of what purported to be Nadel's signature, which they used on medical reports, statements, and bills submitted by Lexington and LN. (*Id.* ¶¶ 61, 62.) The Layperson Controllers used the stamp to "falsely represent and create the appearance that [Nadel] played a role in the performance of the [medical services] and actually reviewed the medical reports and/or bills prior to their submission, when, in fact, [he] did not." (*Id.* ¶ 61.) "In reality," the purported medical services were "performed by healthcare professionals and/or unlicensed technicians" who were "purposely . . . concealed from [Plaintiffs] and treated as independent contractors rather than direct employees for at least some, if not all, of the" medical services performed. (*Id.* ¶ 196.) Defendants knew that Plaintiffs would not pay bills for services rendered by independent contractors. (*Id.* ¶ 200.)

When Lexington or LN submitted a bill to Plaintiffs, the bill included what purported to be the patient's unique internal identification, or "chart," number.  In reality, the numbers were actually part of the system by which the Layperson Controllers tracked the patients across the different medical care facilities they ran, including Lexington and LN.  Each insured patient had a single chart number which was used no matter which facility they supposedly visited.  (*See id.* ¶¶ 74-77.)  For example, the bills submitted by Lexington for one patient bore the chart number "1940."  (*Id.* ¶ 76.)  A few months later, another Defendant entity submitted bills for the same patient with the same chart number, "1940."  (*Id.*)  A few months after that, LN submitted to Plaintiffs bills for the same patient with the same chart number.[2]  (*Id.*)

Lexington and LN "maintained no fixed treatment locations of any kind."  (*Id.* ¶ 79.)  They had no "stand-alone practices," "website," or advertising or marketing of any kind.  (*Id.*)  They did not own or lease "the real property from which they purported to provide" their medical services.  (*Id.*)  "[I]ndeed, [they] provided no legitimate or medically necessary services."  (*Id.*)

## PROCEDURAL HISTORY

On June 6, 2018, Plaintiffs filed the Complaint.  (Dkt. 1.)  They asserted 23 causes of action, including various violations of § 1962(c) and § 1962(d) of the Racketeer Influenced and Corrupt Organization Act, 18 U.S.C. § 1961, *et seq.* ("RICO") against Nadel, common law fraud against the Defaulting Defendants, unjust enrichment against the Defaulting Defendants, and declaratory judgment against LN and Lexington.

Plaintiffs served LN and Lexington on June 20, 2018 and filed proof of such service on June 26, 2018.  (Dkt. 10; Dkt. 11; *see also* Dkt. 61-1 ¶ 5.)  Plaintiffs served Nadel on June 26, 2018 and filed proof of service on August 8, 2018.  (Dkt. 21; *see also* Dkt. 61-1 ¶ 5.)  The Defaulting Defendants

---

[2] Plaintiffs attached to the Complaint "[a] representative sample of bills demonstrating that multiple Defendants used the same unique 'chart' number for a respective Insured."  (Compl. ¶ 76; Dkt. 1-8.)

answered the Complaint on August 3, 2018.  (Dkt. 19.)  They also participated in the initial conference with the Court (*see* Oct. 17, 2018 Dkt. Entry) and proceeded with discovery.

On February 27, 2019, counsel for the Defaulting Defendants filed a letter stating that Nadel could not "be located and/or contacted."  (Dkt. 33.)  During a telephone conference on March 13, 2019, the Court reminded counsel for the Defaulting Defendants "of their duty to locate Nadel and notify him of the risks of failing to appear."  (Mar. 13, 2019 Dkt. Entry.)  Counsel and Nadel were also put "on notice that, by failing to participate in this action, Nadel risk[ed] sanctions up to and including default or monetary fines such as attorneys' fees."  (*Id.*)

Counsel for the Defaulting Defendants moved to withdraw on May 10, 2019.  (Dkt. 45.) Among the reasons stated were counsel's continuing inability to locate or contact Nadel, who had left no current addresses with counsel.  Efforts to reach him at phone numbers and email addresses obtained as a result of "skip-traces" were also fruitless.  (Dkt. 45 ¶¶ 6-9.)  The motion to withdraw was granted, and withdrawing counsel was directed to serve a copy of the order on his former clients and to inform the Court of Nadel's "most up-to-date address."  (May 13, 2019 Dkt. Order.)  On May 23, 2019, the Defaulting Defendants' former counsel filed a letter confirming that he served the May 13, 2019 order on his former clients and providing five potential current addresses for Nadel.  (Dkt. 48.)  Counsel noted that visits by a process server to three of the most likely addresses revealed that Nadel never, or no longer, lived there.  In addition, all emails bounced back as undeliverable, and potential phone numbers were "disconnected, had voicemails which were 'not set up,' and/or did not lead to any return phone calls" from Nadel.  (*Id.* at 2.)  The Defaulting Defendants did not appear either *pro se* or through new counsel after their former counsel withdrew.

Plaintiffs requested certificates of default for Lexington and LN on August 8, 2019 (Dkts. 50, 51), which the Clerk of the Court entered on August 12, 2019 (Dkts. 52, 53).  Plaintiffs requested a

certificate of default for Nadel on August 26, 2019 (Dkt. 55), which was entered on September 4, 2019 (Dkt. 56).

Plaintiffs filed the Motion on December 18, 2019.  (Dkt. 61.)  In the Motion, Plaintiffs stated that they seek default judgment on the following causes of action: (1) violation of § 1962(c) of RICO against Nadel (Third and Seventh Causes of Action); (2) violation of § 1962(d) of RICO against Nadel (Fourth and Eighth Causes of Action); (3) common law fraud against Nadel, Lexington, and LN (Fifth and Ninth Causes of Action); (4) unjust enrichment against Nadel, Lexington, and LN (Sixth and Tenth Causes of Action); and (5) declaratory judgment against Lexington and LN (Twenty-Third Cause of Action).  (Dkt. 61-9.)

## LEGAL STANDARD

Rule 55 of the Federal Rules of Civil Procedure establishes a two-step process regarding default judgment.  First, the Clerk of the Court enters a party's default when a defendant "has failed to plead or otherwise defend."  Fed. R. Civ. P. 55(a).  Second, the plaintiff can apply to the court for a default judgment.  Fed. R. Civ. P. 55(b)(2).  "[J]ust because a party is in default, the plaintiff is not entitled to a default judgment as a matter of right."  *GuideOne Specialty Mut. Ins. Co. v. Rock Cmty. Church, Inc.*, 696 F. Supp. 2d 203, 208 (E.D.N.Y. 2010).

Before a court grants a motion for default judgment, the court may, but is not required to, adjudicate personal jurisdiction.  *See City of New York v. Mickalis Pawn Shop, LLC*, 645 F.3d 114, 133 (2d Cir. 2011) (leaving open the question of "whether a district court *must* investigate its personal jurisdiction over [a] defendant before entering a default judgment" (emphasis and alteration in original)); *Sinoying Logistics Pte Ltd. v. Yi Da Xin Trading Corp.*, 619 F.3d 207, 213 (2d Cir. 2010) ("[B]efore a court grants a motion for default judgment, it may first assure itself that it has personal jurisdiction over the defendant.").

Additionally, the Court must ensure that (1) the plaintiff took all the required procedural steps in moving for default judgment pursuant to Local Civil Rule 55.2(c), and (2) the plaintiff's allegations, when accepted as true, establish liability as a matter of law. *See Finkel v. Romanowicz*, 577 F.3d 79, 84 (2d Cir. 2009). "[A] party's default is deemed to constitute a concession of all well pleaded allegations of liability," *Greyhound Exhibitgroup, Inc. v. E.L.U.L. Realty Corp.*, 973 F.2d 155, 158 (2d Cir. 1992), and the court draws all reasonable inferences in favor of the plaintiff. *See Au Bon Pain Corp. v. Artect, Inc.*, 653 F.2d 61, 65 (2d Cir. 1981). Nevertheless, a default is "not considered an admission of damages." *Greyhound Exhibitgroup*, 973 F.2d at 158. Instead, the plaintiff bears the burden of presenting proof of damages, which may take the form of documentary evidence and detailed affidavits. *See Action S.A. v. Marc Rich & Co.*, 951 F.2d 504, 508 (2d Cir. 1991). The amount of damages awarded, if any, must be ascertained "with reasonable certainty." *Credit Lyonnais Sec. (USA), Inc. v. Alcantara*, 183 F.3d 151, 155 (2d Cir. 1999); *Gunawan v. Sake Sushi Rest.*, 897 F. Supp. 2d 76, 83 (E.D.N.Y. 2012).

With regard to mail fraud – the predicate act for Plaintiffs' RICO claim (*see* Dkt. 61-9 at 8-9, 12-13) – and to Plaintiffs' claim for common law fraud (*see id.* at 15-18), Plaintiffs must also satisfy the heightened pleading standard of Federal Rule of Civil Procedure 9(b). *See Allstate Ins. Co. v. Nazarov*, No. 11-CV-6187 (PKC)(VMS), 2015 WL 5774459, at *12 , *14 (E.D.N.Y. Sept. 30, 2015) (applying, in a case brought by insurance companies against defendants for engaging in no-fault insurance fraud, Rule 9(b) to both the plaintiffs' § 1962(c) claims and the common law fraud claims). Rule 9(b) states, "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."

"[I]n complex civil RICO actions involving multiple defendants, Rule 9(b) does not require that the temporal or geographic particulars of each mailing made in furtherance of the fraudulent scheme be stated with particularity, but requires instead only that the plaintiff delineate, with adequate particularity in the body of the complaint, the specific circumstances constituting the overall fraudulent

scheme." *Gov't Emps. Ins. Co. v. Hollis Med. Care, P.C.*, No. 10-CV-4341 (ILG)(RML), 2011 WL 5507426, at *8 (E.D.N.Y. Nov. 9, 2011) (quotations and citation omitted).

A court "possesses significant discretion" in granting a motion for default judgment, "including whether the grounds for default are clearly established and the amount of money potentially involved." *Klideris v. Trattoria El Greco*, No. 10-CV-4288 (JBW)(CLP), 2011 WL 7114003, at *2 (E.D.N.Y. Sept. 23, 2011), *R&R adopted*, 2012 WL 273078 (E.D.N.Y. Jan. 30, 2012).

## DISCUSSION

### I.    Jurisdiction

The court from which default judgment is sought must assure itself that it has subject matter jurisdiction over the action. *See Mickalis*, 645 F.3d at 125-27. This Court has subject matter jurisdiction over Plaintiffs' RICO and declaratory judgment claims pursuant to 28 U.S.C. § 1331, and subject matter jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367.

The Court may also inquire as to whether it has personal jurisdiction. *See Mickalis*, 645 F.3d at 133. The undersigned finds that the Court has personal jurisdiction over the Defaulting Defendants because they answered the Complaint and did not assert lack of personal jurisdiction or venue as an affirmative defense. (*See* Dkt. 19.) *See Motown Rec. Co. v. Motown Beverage Co. of Ohio*, No. 97-9612, 1998 WL 781449, at *1 (2d Cir. Nov. 6, 1998) (holding that the defaulting defendant "effectively waived his challenge to personal jurisdiction and venue by filing an answer which did not set forth these defenses").

### II.    Procedural Compliance

Pursuant to Local Civil Rule 55.1, Plaintiffs properly moved for certificates of default for each of the Defaulting Defendants on August 8, 2019 and August 26, 2019. (Dkts. 50, 51, 55.) The Clerk of the Court entered the certificates for Lexington and LN on August 12, 2019 and for Nadel on September 4, 2019. (Dkts. 52, 53, 56.)

As part of their Motion, Plaintiffs included a notice of motion (Dkt. 61; Local Civ. R. 7.1(a)(1)), a memorandum of law (Dkt. 61-9; Local Civ. R. 7.1(a)(2)), a proposed form of default judgment (Dkt. 61-4; Local Civ. R. 55.2(b)), and proof that Nadel is not on active military duty (Dkts. 61-1 ¶¶ 12-13, 61-2; Local Civ. R. 55.1(b)).  Plaintiffs' counsel, Ryan Goldberg, also stated in his Declaration that copies of the Motion were mailed to each Defaulting Defendant.  (Dkt. 61-1 ¶ 20; Local Civ. R. 55.2(c).)

Plaintiffs did not attach a copy of the Complaint or copies of the certificates of default to the Motion, as required by Local Civil Rule 55.2(b)(1) and (2).  However, the undersigned does not find there to be prejudice to the Defaulting Defendants because they already received and answered the Complaint.  In addition, Plaintiffs mailed the Motion to the Defaulting Defendants, so they were notified of the proceeding.  Accordingly, the undersigned respectfully recommends finding that Plaintiffs satisfied their procedural requirements. *See Holtz v. Rockefeller & Co.*, 258 F.3d 62, 73 (2d Cir. 2001) ("A district court has broad discretion to determine whether to overlook a party's failure to comply with local court rules.").

## III.   Nadel's Liability Under RICO

Plaintiffs allege that Nadel's conduct violated 18 U.S.C. § 1962(c) and § 1962(d).  (Dkt. 61-9 at 7-15.)  The undersigned considers each in turn.

### A.   *Substantive RICO Claim Under Section 1962(c)*

Civil RICO makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt."  18 U.S.C. § 1962(c).  Plaintiffs must allege seven elements to state a claim for civil RICO: "(1) that the defendant (2) through the commission of two or more acts (3) constituting a pattern (4) of racketeering activity (5) directly or indirectly invests in, or maintains

an interest in, or participates in (6) an enterprise (7) the activities of which affect interstate or foreign commerce." *Hinterberger v. Cath. Health Sys., Inc.*, 536 F. App'x 14, 16 (2d Cir. 2013) (quotations and citation omitted).

### 1.     *Nadel and the Enterprises (Elements One and Six)*

RICO defines the terms "person" and "enterprise."  A "'person' includes any individual or entity capable of holding a legal or beneficial interest in property."  18 U.S.C. § 1961(3).  An "'enterprise' includes any individual, partnership, corporate, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." *Id.* § 1961(4).  The person, *i.e.*, the defendant, and the enterprise must be "sufficiently distinct." *Riverwoods Chappaqua Corp. v. Marine Midland Bank, N.A.*, 30 F.3d 339, 344 (2d Cir. 1994); *see also Allstate Ins. Co. v. Rozenberg*, 590 F. Supp. 2d 384, 390 (E.D.N.Y. 2008) ("However, under Section 1962(c), it is well-established that the alleged 'enterprise' through which a pattern of racketeering activity is conducted must be distinct from those persons or entities who stand accused of conducting that racketeering activity.").  "[A] section 1962(c) claim may be sustained where there is only a partial overlap between the RICO person and the RICO enterprise, and . . . a defendant may be a RICO person and one of a number of members of the RICO enterprise." *Riverwoods Chappaqua Corp.*, 30 F.3d at 344 (quotations and citations omitted).

Nadel is an individual and the person against whom this claim is asserted.  (Compl. ¶¶ 3, 9, 12; Dkt. 61-9 at 7.)   Thus, Nadel is a person within the meaning of RICO. *Nazarov*, 2015 WL 5774459, at *11 (holding that those defendants who are "individuals . . . are 'persons' within the meaning of the statute").  Plaintiffs also established that Lexington and LN are corporations that are legally distinct from Nadel.  (Compl. ¶¶ 1, 10-12, 47, 51, 61.)  *See Sky Med. Supply Inc. v. SCS Support Claims Servs., Inc.*, 17 F. Supp. 3d 207, 223 (E.D.N.Y. 2014) ("By identifying SCS and Patient Focus—a corporation and professional corporation, respectively—as the RICO enterprises, plaintiff has properly pleaded the enterprise element of a RICO claim.").

2.    *Commission of Two or More Acts that Constitute a Pattern of Racketeering Activity (Elements Two, Three, and Four)*

The RICO statute defines "racketeering activity" as including "any act which is indictable under" certain specified "provisions of title 18."  18 U.S.C. § 1961(1)(B).  One such provision is mail fraud.  *Id.* (listing "section 1341 relating to mail fraud)"); *see also Nakahata v. N.Y.-Presbyterian Healthcare Sys., Inc.*, 723 F.3d 192, 204 (2d Cir. 2013) ("Mail fraud, pursuant to 18 U.S.C. § 1341, is among the activities defined as racketeering." (citing *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 482 n.3 (1985)).

To state a claim for mail fraud, the plaintiff "must show (1) the existence of a scheme to defraud, (2) defendant's knowing or intentional participation in the scheme, and (3) the use of interstate mails . . . in furtherance of the scheme."  *S.Q.K.F.C., Inc. v. Bell Atl. Tricon Leasing Corp.*, 84 F.3d 629, 633 (2d Cir. 1996) (citation omitted).  The mail fraud statute's "causation requirement" is construed "liberally."  *United States v. Tocco*, 135 F.3d 116, 124 (2d Cir. 1998).  The plaintiff "need only" show that the defendant "acted with 'knowledge that the use of the mails will follow in the ordinary course of business,' or that 'such use can reasonably be foreseen, even though not actually intended.'"  *Id.* (quoting *Pereira v. United States*, 347 U.S. 1, 8-9 (1954)); *see also Nazarov*, 2015 WL 5774459, at *12 (applying the liberal causation requirement set forth in *Tocco* in the context of a civil RICO claim regarding the alleged misuse of the No-Fault Laws).  "[A] mailing is in furtherance of a fraudulent scheme when it is incidental to an essential part of the scheme or a step in the plot."  *Tocco*, 135 F.3d at 124 (quotations, citations, and alterations omitted).

The RICO statute defines "pattern of racketeering activity" as "at least two acts of racketeering activity" that occur within ten years of each other.  18 U.S.C. § 1961(5).  These acts must be "related" and must "amount to, or pose a threat of, continuing criminal activity."  *Schlaifer Nance & Co. v. Estate of Warhol*, 119 F.3d 91, 97 (2d Cir. 1997).  "Predicate acts are 'related' for RICO purposes when they 'have the same or similar purposes, results, participants, victims, or methods of commission, or

otherwise are interrelated by distinguishing characteristics and are not isolated events.'" *Id.* (quoting *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 240 (1989)).

The "continuing criminal activity" requirement is also referred to as the "continuity requirement." *GICC Cap. Corp. v. Tech. Fin. Grp., Inc.*, 67 F.3d 463, 465-66 (2d Cir. 1995). "[A] plaintiff in a RICO action must allege either an 'open-ended' pattern of racketeering activity (*i.e.*, past criminal conduct coupled with a threat of future criminal conduct) or a 'closed-ended' pattern of racketeering activity (*i.e.*, past criminal conduct extending over a substantial period of time)." *Id.* at 466 (quotation omitted). "Where an inherently unlawful act is performed at the behest of an enterprise whose business is racketeering activity, there is a threat of continued criminal activity, and thus open-ended continuity." *DeFalco v. Bernas*, 244 F.3d 286, 323 (2d Cir. 2001).

Here, Plaintiffs allege that between May 2015 and September 2016, Lexington and LN repeatedly mailed documents – including NF-3 forms, medical records, and supporting documentation – to Plaintiffs that were false or misleading. (Compl. ¶¶ 10, 52, 203-04, 218.) In Exhibits 1 and 2 to the Complaint, Plaintiffs set forth a description of the documents Lexington and LN mailed, the dates on which Lexington and LN allegedly performed the services for which they billed, the dates of the mailings, the claim numbers, the insurance codes, and the amounts billed. (*See* Dkts. 1-3, 1-4.)

According to Plaintiffs, these documents were materially false and misleading because: (1) the documents "misrepresented" that the procedures performed were medically necessary when, in fact, they were provided "pursuant to a pre-determined protocol and financial and referral relationships that financially enriched the Defendants, rather than legitimately treating or otherwise benefiting" the insured individuals (Compl. ¶ 204(i)); (2) "the documentation submitted . . . misrepresented and/or exaggerated the scope and/or level of services that purportedly were provided" (*id.* ¶ 204(ii)); (3) in contravention of the applicable laws and regulations, Lexington and LN were run by the Layperson

Controllers, who were not medical professionals (*id.* ¶ 204(iii)); and (4) in further contravention of those laws and regulations, certain services were provided by independent contractors (*id.* ¶ 204(iv)).

Plaintiffs explain with great specificity that Lexington and LN performed medically unnecessary procedures on individuals insured by Plaintiffs and then submitted bills for these procedures to Plaintiffs. (*Id.* ¶¶ 94, 97-114, 128-86.) Plaintiffs support their allegations that the procedures were medically unnecessary with detailed explanations of when medical practitioners typically use these procedures and how Lexington and LN wrongly deviated from that usage. (*See, e.g.,* *id.* ¶¶ 100-14, 128-86.) For example, Lexington and LN performed a series of tests known as "pain fiber nerve conduction studies" on insured individuals allegedly "to diagnose abnormalities in the [individuals'] peripheral nerves and nerve roots." (*Id.* ¶¶ 142, 152.) However, there is "no legitimate medical evidence" that shows that such "tests are in any way useful, let alone medically necessary, to diagnose" these abnormalities. (*Id.* ¶ 167; *see also id.* ¶¶ 157-69.) Even if such evidence did exist, Plaintiffs explain that tests purporting to measure an individual's peripheral nerves and nerve roots are ineffective more than 21 days after an accident. (*See id.* ¶ 182.) Nevertheless, Lexington and LN submitted bills to Plaintiffs for tests they performed on patients more than 21 days after they were allegedly injured. Plaintiffs set forth ten examples of these bills in the Complaint. (*Id.*)

Plaintiffs also allege that Lexington and LN "unbundled their billing for [ ] tests, which maximized the fraudulent charges that they could submit to [Plaintiffs]." (*Id.* ¶ 115.) For example, Lexington and LN performed computerized range of motion and muscle tests on individuals insured by Plaintiffs. Typically, these tests are performed together and billed together using the same code. The billing is done in fifteen-minute increments and, according to Plaintiffs, the two tests combined never take more than thirty minutes. Thus, when a medical facility performs both tests on an individual, it would seek, at most, reimbursement for two fifteen-minute tests. However, when Lexington and LN submitted their bills for reimbursement, they unbundled the range of motion and

muscle tests, submitting each under separate insurance codes.  This allowed Lexington and LN wrongly to recover more money from Plaintiffs.  (*See id.* ¶¶ 115-21.)

In support of their allegation that independent contractors and not Nadel performed the medical services Lexington and LN submitted for reimbursement, Plaintiffs explain that individuals insured by Plaintiffs described under oath the practitioners who treated them, and those descriptions did not resemble Nadel.  (*Id.* ¶ 197.)  Plaintiffs also state that, according to bills submitted by Lexington and LN, Nadel performed multiple medical procedures at different locations in far-ranging parts of New York City on the same day, which is implausible.  (*See id.* ¶ 198.)  Finally, Plaintiffs state that Nadel could not have provided medical services because he resided in "Canada for the duration of the fraudulent scheme."  (*Id.* ¶ 199.)

Plaintiffs also allege that Lexington and LN are not legitimate medical practices.  Nadel created them specifically for the purpose of committing fraud.  (*Id.* ¶¶ 47, 51, 87, 196, 198-99, 235, 261.)  Because Lexington and LN did not have fixed locations, they submitted bills to Plaintiffs using private mailboxes as their billing addresses.  (*Id.* ¶¶ 66, 79.)  They did not have websites, did not engage in any advertising or marketing, and did not own or lease any real property.  (*Id.* ¶ 79.)

These allegations suffice to establish Lexington and LN engaged in a pattern of racketeering activity, *i.e.*, mail fraud.  *See Allstate Ins. Co. v. Lyons*, No. 11-CV-2190 (PKC)(PK), 2016 WL 11430776, at *6 (E.D.N.Y. Sept. 12, 2016), *R&R adopted*, Oct. 3, 2016 Dkt. Order (holding that the plaintiffs established a pattern of racketeering activity by alleging that the defendants engaged "in a scheme to defraud [an insurer] and [repeatedly] used interstate mails in furtherance of that scheme" by "mail[ing] (or caus[ing] to be mailed) medical documentation . . . to [the insurer] from [the RICO enterprise], . . . seeking No-Fault Benefits for which [the enterprise] was not eligible" (footnote omitted)); *Nazarov*, 2015 WL 5774459, at *13 (finding that the plaintiff satisfied Rule 9(b) when it "provided specific descriptions of a large sample of fraudulent claims mailed by each RICO enterprise, including

descriptions of the fraudulent documents mailed (*i.e.*, claims, prescriptions, and invoices), identification of the fraudulent representations in each claim, and the approximate date the claim was mailed"). They also establish that the primary business of Lexington and LN was racketeering activity and, therefore, the open-ended continuity requirement has been satisfied. *See Sky Med. Supply, Inc.*, 17 F. Supp. 3d at 228 ("[P]laintiff's allegations suffice to establish open-ended continuity with respect to all moving defendants. Specifically, the gravamen of plaintiff's [allegations] is that SCS and Patient Focus operated primarily by committing mail fraud, even if they also conducted some legitimate business.").

### 3.    *Nadel's Conduct of or Participation in the Pattern of Racketeering Activity (Element Five)*

Section 1962(c) requires the defendant "to conduct or participate, directly or indirectly, in the conduct of [the RICO] enterprise's affairs." 18 U.S.C. § 1962(d). The word "conduct," as used "in this subsection" "requires an element of direction." *Reves v. Ernst & Young*, 507 U.S. 170, 178 (1993). Section 1962(c)'s use of "participate," "require[s]" the defendant to have "some part in th[e] direction" of the RICO enterprise's affairs, although it does not require that the defendant has "primary responsibility" for those affairs. *Id.* at 179.

Plaintiffs allege that Nadel incorporated Lexington and LN (Compl. ¶¶ 10-11, 47, 51), allowed the Layperson Controllers to use those companies and his medical license to submit fraudulent documents to Plaintiffs (*id.* ¶¶ 10-12, 47-48, 51), and created a stamp of his signature for the Layperson Controllers to use on those documents to create the impression that Nadel was actually performing the medical procedures (*id.* ¶¶ 61-62, 65). This suffices to establish that Nadel participated in the conduct of the RICO enterprise's affairs. *See Liberty Mut. Ins. Co. v. Excel Imaging, P.C.*, 879 F. Supp. 2d 243, 275 (E.D.N.Y. 2012) ("Liberty Insurance's allegations that Excel was owned and controlled by the Management Defendants and that the Nominal Owner Defendants agreed to serve as the

'paper' owners of Excel in exchange for a fee are sufficient to support the claim that the defendants actively participated in the creation or management of Excel.").

### 4.    Interstate or Foreign Commerce (Element 7)

The enterprise's activities affected interstate commerce because it sent fraudulent documentation from Lexington and LN, which are located in New York (Compl. ¶¶ 10-11), to Plaintiffs, which are located in Illinois (*id.* ¶ 9). *See Lyons*, 2016 WL 11430776, at *5 (holding that the RICO enterprise's "activities affect interstate commerce because it submitted medical documentation to Plaintiffs—corporations with principal places of business in Northbrook, Illinois and Bridgewater, New Jersey").

\*        \*        \*

Accordingly, the undersigned respectfully recommends finding that Nadel is liable for violation of RICO under 18 U.S.C. § 1962(c).

## B.    RICO Conspiracy Claim Under Section 1962(d)

Section 1962(d) makes it "unlawful for any person to conspire to violate any of the" other provisions of § 1962.  18 U.S.C. § 1962(d).  Once a plaintiff shows that "a RICO enterprise exists, the [plaintiff] must prove only that the defendants know the general nature of the conspiracy and that the conspiracy extends beyond their individual roles."  *United States v. Zichettello*, 208 F.3d 72, 99 (2d Cir. 2000) (quotation, citation, and alterations omitted); *see also Gov't Emps. Ins. Co. v. Simakovsky*, No. 14-CV-3775 (KAM)(SMG), 2015 WL 5821407, at *7 (E.D.N.Y. Oct. 5, 2015) (applying the rule set forth in *Zichettello* in a civil RICO case).  It is only necessary to plead that a defendant "knew what the other conspirators 'were up to' or whether the situation would logically lead an alleged conspirator 'to suspect he was part of a larger enterprise.'"  *Zichettello*, 208 F.3d at 99 (quoting *United States v. Viola*, 35 F.3d 37, 44-45 (2d Cir. 1994)).

Here, not only do Plaintiffs allege that Nadel knew what his co-conspirators were up to, they also allege that he was the one who set in motion a system by which the other conspirators – LN, Lexington, and the Layperson Controllers – would advance the enterprise. Plaintiffs allege that Nadel incorporated two companies in New York, where he did not live, knowing that he would not be seeing patients there himself. Rather, he ceded supervision of the companies to the Layperson Controllers – and permitted independent contractors to treat patients – so that they could submit fraudulent bills to Plaintiffs. (Compl. ¶¶ 10-12, 47, 51, 61, 193, 195-96, 199, 235, 261.) As part of the conspiracy, he knowingly created a stamp of his signature so that the Layperson Controllers and others could create the impression that Nadel was involved in the medical procedures performed or that he reviewed and approved the documentation Lexington and LN submitted to Plaintiffs. (*Id.* ¶¶ 61-62, 65, 195-96.) All of these acts show that Nadel knew the nature of the conspiracy and that the conspiracy extended beyond his individual role. *See Gov't Emps. Ins. Co. v. Parkway Med. Care, P.C.*, No. 15-CV-3670 (FB)(VMS), 2017 WL 1133282, at *14 (E.D.N.Y. Feb. 21, 2017), *R&R adopted*, 2017 WL 1131901 (E.D.N.Y. Mar. 24, 2017) (holding that the plaintiffs established a § 1962(d) claim when they alleged that the defendants "knew of the general nature of the conspiracy and that the conspiracy extended beyond [the defendants'] individual roles").

Accordingly, the undersigned respectfully recommends finding that Plaintiffs have established a § 1962(d) claim of RICO conspiracy against Nadel.

## IV.    State Common Law Fraud Claims

Plaintiffs allege that Nadel, Lexington, and LN engaged in common law fraud. (Dkt. 61-9 at 15-18.)

There are five elements to a fraud claim in New York: "(1) a material representation or omission of fact; (2) made with knowledge of its falsity; (3) with scienter or an intent to defraud; (4)

upon which the plaintiff reasonably relied; and (5) such reliance caused damage to the plaintiff." *Anwar v. Fairfield Greenwich Ltd.*, 728 F. Supp. 2d 372, 414 (S.D.N.Y. 2010) (quotation and citation omitted).

### A. Material Misrepresentations or Omissions Made with Knowledge of Falsity

As set forth above, the Defaulting Defendants knowingly made numerous, material misrepresentations to Plaintiffs. These include misrepresentations about whether the medical procedures they performed were medically necessary, the scope of the medical services they provided, who ran Lexington and LN, and whether certain services were provided by independent contractors. *See supra* Section III(A)(2). Plaintiffs have pleaded these misrepresentations with the specificity required by Rule 9(b). *See Parkway Med. Care*, 2017 WL 1133282, at *7 (holding that similar allegations were sufficient to establish the first two elements of fraud); *Excel Imaging, P.C.*, 879 F. Supp. 2d at 273 (holding that similar misrepresentations were material because they rendered the defendant eligible for reimbursement by the plaintiff insurer); *see also State Farm Mut. Auto. Ins. Co. v. James M. Liguori, M.D., P.C.*, 589 F. Supp. 2d 221, 237-38 (E.D.N.Y. 2008) (finding that similar allegations satisfy Rule 9(b) because "Rule 9(b) does not require that each specific misrepresentation be identified where an ongoing fraudulent scheme is alleged").

### B. Scienter

Allegations of scienter satisfy Rule 9(b) when they "give rise to a strong inference of fraudulent intent," which "may be established either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 290-91 (2d Cir. 2006) (quotations and citations omitted). According to the Second Circuit, "the requisite intent exists when it is clear that a scheme, viewed broadly, is necessarily going to injure." *AUSA Life Ins. Co. v. Ernst & Young*, 206 F.3d 202, 220 (2d Cir. 2000) (quotation, citation, and alteration omitted); *see also*

*Lyons*, 2016 WL 11430776, at \*7 (applying the rule from *AUSA Life Ins. Co.* to a common law fraud claim in a case that alleges substantially similar facts to the instant action).

Plaintiffs established that the scheme they alleged, when viewed broadly, was necessarily going to injure. The Defaulting Defendants' misrepresentations and omissions were designed to cause Plaintiffs to pay more money in reimbursements than Plaintiffs would have paid without the misrepresentations and omissions. *See Lyons*, 2016 WL 11403776, at \*7 ("[T]he allegations permit the conclusion that [the defendant] acted with the requisite intent to defraud because, at a minimum, [the defendant] could have reasonably foreseen that his deliberate material misrepresentations to [the plaintiff] would cause harm to [it].").

Further, Plaintiffs have also "sufficiently establish[ed] scienter, as Defaulting Defendants had a strong motive to commit fraud, *i.e.*, to gain a financial benefit . . . , and opportunity to commit fraud, *i.e.*, misrepresenting in submissions to Plaintiffs that . . . the healthcare services provided were medically necessary, and that the services were provided by licensed healthcare providers rather than by unlicensed technicians." *Parkway Med. Care, P.C.*, 2017 WL 1133282, at \*8. (*See* Compl. ¶¶ 206-12.)

## C.    *Reasonable Reliance*

"A plaintiff's reliance on intentionally fraudulent statements is reasonable without further investigation when 'matters are held to be peculiarly within defendant's knowledge[,] as plaintiff has no independent means of ascertaining the truth.'" *Simakovsky*, 2015 WL 5821407, at \*7 (quoting *Lazard Freres & Co. v. Protective Life Ins. Co.*, 108 F.3d 1531, 1542 (2d Cir. 1997)) (alterations omitted).

Plaintiffs allege that their reliance on the Defaulting Defendants' misrepresentations was reasonable because (1) the Defaulting Defendants were "legally and ethically obligated to act honestly and with integrity in connection with the billing and other documentation they submitted" (Compl. ¶ 205), (2) the Defaulting Defendants took extensive measures to conceal their fraud (*see id.* ¶¶ 206-12),

(3) Plaintiffs "are under statutory and contractual obligations to promptly and fairly process claims within 30 days" (*id.* ¶ 213), and (4) the documents the Defaulting Defendants submitted were "facially-valid" (*id.*).  These allegations are sufficient to establish reasonable reliance.  *See Gov't Emps. Ins. Co. v. Spectrum Neurology Grp., LLC*, No. 14-CV-5277 (ENV)(SMG), 2016 WL 11395017, at *4 (E.D.N.Y. Feb. 17, 2016), *R&R adopted*, 2016 WL 1071099 (E.D.N.Y. Mar. 18, 2016) (holding that the plaintiffs "adequately alleged reasonable reliance by explaining that statutory and contractual requirements obligate plaintiffs to respond promptly to facially valid claims submitted under New York's no-fault statutory scheme," and "alleg[ed] that defaulting defendants actively concealed their fraud" (citations omitted)); *Simakovsky*, 2015 WL 5821407, at *10 ("[The plaintiff] alleges that the defendants systematically concealed their fraud and that it reasonably relied on fraudulent statements made by the defaulting defendants." (citation omitted)).

## D.   Damages

Plaintiffs satisfy the final element of common law fraud by stating that "in connection with the [Defaulting Defendants'] fraudulent scheme, [Plaintiffs] voluntarily paid a total of $177,539.42 in reliance on Lexington's and LN's billing."  (Dkt. 61-5 ¶ 8; *see also* Dkt. 61-6.)  *See Spectrum Neurology Grp., LLC*, 2016 WL 11395017, at *4 ("Finally, plaintiffs have established that they were damaged, as they paid $501,504.18 in reimbursements to which defaulting defendants were not legally entitled." (citations omitted)).

## V.   Unjust Enrichment Claims

"A plaintiff asserting a claim for unjust enrichment under New York law must establish (1) that the defendant benefitted; (2) at the plaintiff's expense; and (3) that equity and good conscience require restitution."  *Simakovsky*, 2015 WL 5821407, at *7 (quotation and citation omitted).  "An unjust enrichment claim is not available where it simply duplicates, or replaces, a conventional contract or tort claim."  *Corsello v. Verizon N.Y., Inc.*, 18 N.Y.3d 777, 790-91 (N.Y. 2012) (citation omitted).

Instead, it is available only "when, though the defendant has not breached a contract nor committed a recognized tort, circumstances create an equitable obligation running from the defendant to the plaintiff." *Id.* at 790.

Here, Plaintiffs fail to show how their unjust enrichment claim is distinct from their other claims. (*See* Dkt. 61-9 at 19.) Accordingly, the undersigned respectfully recommends that the Motion be denied as to this claim. *See Lyons*, 2016 WL 11430776, at *8 (finding that unjust enrichment is "unavailable" to the plaintiffs where they "rel[ied] on the same allegations that support their common law fraud claim to support their unjust enrichment claim").

## VI.    Request for Declaratory Relief

"In a case of actual controversy within its jurisdiction . . . any court of the United States . . . may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a). Declaratory relief is "proper only (1) where the judgment will serve a useful purpose in clarifying and settling the legal relations in issue; or (2) when it will terminate and afford relief from the uncertainty, insecurity and controversy giving rise to the proceedings." *Md. Cas. Co. v. Rosen*, 445 F.2d 1012, 1014 (2d Cir. 1971) (citation omitted). "[T]he Declaratory Judgment Act has been understood to confer on federal courts unique and substantial discretion in deciding whether to declare the rights of litigants." *Wilton v. Seven Falls Co.*, 515 U.S. 277, 286 (1995).

Plaintiffs request a declaration that "they are not obligated to pay Lexington's and LN's outstanding claims, which amount to $604,034.70." (Dkt. 61-9 at 20; Dkt. 61-5 ¶ 9.) To support their declaratory relief request, Plaintiffs submitted the Declaration of Michael Knox. ("Knox Declaration," Dkt. 61-5.) Knox is an employee of State Farm Mutual Automobile Insurance Company, "which is comprised of numerous subsidiaries and affiliated insuring companies, including but not limited to State Farm Fire and Casualty Company." (*Id.* ¶ 1.) As of the date of the Motion's

filing, Knox had worked for State Farm Automobile Insurance Company for 29 years, 23 of which were "as a Team Manager in the Special Investigative Unit." (*Id.*)  This unit "identif[ies], investigate[s], evaluate[s] and resolve[s] assignments regarding suspicious claims activity, including whether claims submitted by health care providers are fraudulent." (*Id.*)

Attached to the Knox Declaration are three charts, the first of which is the "Payment Chart," "which sets forth the amount of payments that [Plaintiffs] voluntarily paid Lexington and LN in connection with the fraudulent scheme." (*Id.* ¶ 5.)  The information in the Payment Chart "was compiled via [Plaintiffs'] earnings reporting system," which tracks, by tax identification number, authorized payments made by Plaintiffs to healthcare providers. (*Id.*)  The second chart is the "Claims Chart," "which sets forth claim information, include the number and amount of claims (i.e., bills) that were submitted to [Plaintiffs] through Lexington and LN in connection with the fraudulent scheme." (*Id.* ¶ 6.)  "When a healthcare provider submits a bill seeking payment to [Plaintiffs], the information contained on the bill . . . is entered into the claims system before any action is taken with respect to the bill." (*Id.* ¶ 6.)  The third chart is the "Litigation Chart," which "indicates that [ ] LN has 19 arbitrations pending [against Plaintiffs] in an attempt to collect on [LN's] outstanding bills." (*Id.* ¶ 10.)  The information in this chart is compiled from Plaintiffs' claim system, where Plaintiffs enter "the information associated with the" legal proceeding "before any action is taken." (*Id.* ¶ 7.)  The information in all three charts are compiled and maintained in the ordinary course of Plaintiffs' business. (*Id.* ¶¶ 5-7.)

By comparing the Claims Chart, which details all claims submitted by Lexington and LN, with the Payment Chart, which details only those claims that Plaintiffs have already paid, Knox was able to determine that "the amount of unpaid claims in dispute between [Plaintiffs] and the Defaulting Defendants is approximately $604,034.70." (*Id.* ¶ 9.)

Plaintiffs have established "that a declaratory judgment would afford specific and conclusive relief as to pending claims." *Parkway Medical Care, P.C.*, 2017 WL 1133282, at *9.  They have shown that the pending claims are fraudulent, like those claims Plaintiffs have already paid, and they "have established that there is an actual controversy as to which a declaratory judgment would afford specific relief." *Id.*[3]

Accordingly, the undersigned respectfully recommends that the Court grant Plaintiffs' request for a declaration that they are not obligated to pay the claims submitted by Lexington and LN, as listed on Plaintiffs' Claims Chart (Dkt. 61-7), which remain unpaid and outstanding.

## VII.    Monetary Relief

Damages in a default judgment action must be established "with reasonable certainty." *Transatlantic Marine Claims Agency, Inc. v. Ace Shipping Corp.*, 109 F.3d 105, 111 (2d Cir. 1997).  To do so, "it is not necessary for the District Court to hold a hearing as long as it ensured that there was a basis for the damages specified in the default judgment." *Id.* (quotation, citation, and alteration omitted). This basis may come from "detailed affidavits and documentary evidence." *Fustok v. ContiCommodity Servs., Inc.*, 873 F.2d 38, 40 (2d Cir. 1989).

### A.    State Common Law Fraud Damages

Plaintiffs submit the Knox Declaration and the Payment Chart in support of their damages request.  (*See* Dkt. 61-5; Dkt. 61-6.)  The Payment Chart has a separate line for each payment Plaintiffs

---

[3] Some cases have stated that state law is the substantive law that should be applied to evaluating an insurer's request for a declaration that it does not have to pay pending claims submitted by the defendants.  *See Gov't Emps. Ins. Co. v. AMD Chiropractic, P.C.*, No. 12-CV-4295 (NG)(JO), 2013 WL 5131057, at *7 (E.D.N.Y. Sept. 12, 2013) ("A federal court applies the substantive law of the state in which it sits when deciding whether to award declaratory relief.").  However, not every case evaluating such requests appears to apply state law.  *See Parkway Med. Care, P.C.*, 2017 WL 1133282, at *9.  The undersigned finds it unnecessary to determine whether state law applies here, as the recommended resolution of Plaintiffs' request for declaratory judgment would be the same regardless of whether state law applied.  *See AMD Chiropractic, P.C.*, 2013 WL 5131057, at *7-8 (holding that facts substantially similar to those asserted by Plaintiffs satisfied New York law and, thus, were "sufficient" for declaratory relief).

made to Lexington and LN on specific claims.  (*See* Dkt. 61-6.)  The Chart, together with the Knox

Declaration, is sufficient to establish damages.  *See Lyons*, 2016 WL 11430776, at *8 (finding that similar

submissions "provide the basis for the factual findings [ ] concerning damages").

Based upon the Payment Chart, Knox calculated that Plaintiffs paid $88,883.41 to Lexington

from July 24, 2015 to March 28, 2017, and $88,656.01 to LN from September 6, 2016 to March 16,

2017.  (Dkt. 61-5 ¶ 8).  Plaintiffs seek default judgments against each entity in those amounts.  (Dkt.

61-4 at 3.)  Plaintiffs also seek a judgment that Nadel is jointly and severally liable for the amounts

they paid to Lexington and LN.  (*Id.*)  Such a judgment is appropriate because Nadel is "jointly and

severally liable for common law damages with the entities through which [he] directly participated in

submitting claims."  *A & F Med. P.C.*, 2019 WL 7842516, at *8.

Accordingly, the undersigned respectfully recommends that Plaintiffs be awarded damages of

$88,883.41 jointly and severally against Lexington and Nadel, and $88,656.01 jointly and severally

against LN and Nadel.  *See AMD Chiropractic, P.C.*, 2013 WL 5131057, at *8.

## B.    RICO Claims Damages

Plaintiffs seek RICO damages from Nadel in the amount of the payments Plaintiffs made to

Lexington and LN, *i.e.*, $88,883.41 and $88,656.01, respectively.  (*See* Dkt. 61-9 at 13.)  They also

request that these damages be trebled to $266,650.23 and $265,968.03, "representing three times the

actual amounts that [Plaintiffs] paid in reliance on the billing that was submitted or caused to be

submitted by Nadel through Lexington, and LN," respectively.  (*Id.* at 21.)  Plaintiffs submit the Knox

Declaration and the Payment Chart in support of this request.  (*See id.*; Dkt. 61-5 ¶ 8; Dkt. 61-6.)

"Any person injured in his business or property by reason of a violation of section 1962 of

this chapter may sue therefor in any appropriate United States district court and shall recover threefold

the damages he sustains . . . ."  18 U.S.C. § 1964(c).  Treble damages "are appropriately awarded in the

context of a default."  *AMD Chiropractic, P.C.*, 2013 WL 5131057, at *8.  Accordingly, the undersigned

respectfully recommends that damages against Nadel be trebled, such that the award related to payments to Lexington is $266,650.23, and the award related to payments to LN is $265,968.03. Because Plaintiffs cannot "recover their actual damages twice," *A & F Med. P.C.*, 2013 WL 5131057, at *7 (quotations and citation omitted), they may only be compensated for the amount of money they paid to LN and Lexington one time. Accordingly, if Lexington and LN pay the damages against them, Nadel would only be liable for the remaining amounts (*i.e.*, $177,766.82 and $177,312.02, respectively).

### C.     Prejudgment Interest on Common Law Fraud Claims

Plaintiffs seek prejudgment interest on their fraud claims only. (*See* Dkt. 61-9 at 21.) "On a state law claim, this court must look to New York law regarding an award of pre-judgment interest." *AMD Chiropractic, P.C.*, 2013 WL 5131057, at *9. Prejudgment interest is awarded pursuant to N.Y. C.P.L.R. § 5001(a). Because § 5001(a) states "that prejudgment interest 'shall be recovered upon a sum awarded . . . ' New York courts have long held that interest is recoverable as a matter of right in [fraud] cases." *Mallis v. Bankers Tr. Co.*, 717 F.2d 683, 693 (2d Cir. 1983) (quoting N.Y. C.P.L.R. § 5001(a)) (collecting cases). "An award of pre-judgment interest on the state law fraud claims is not precluded by an award of treble damages on the RICO Act claims arising from the same conduct." *AMD Chiropractic, P.C.*, 2013 WL 5131057, at *9.

"New York law provides for an annual simple interest rate of nine percent." *Id.* (citing N.Y. C.P.L.R. § 5004). Plaintiffs request that the interest "be calculated from the first day following the first year in which the payments were made on the fraudulent claims by [Plaintiffs] to the Defaulting Defendants." (Dkt. 61-9 at 22; *see also* Dkt. 61-1 ¶ 17; Dkt. 61-3.) For example, interest on Plaintiffs' 2015 payments to Lexington would begin to accrue interest on January 1, 2016. (*See* Dkt. 61-3.) "This methodology has been followed in this district in other no-fault insurance fraud cases awarding damages on default judgment." *AMD Chiropractic, P.C.*, 2013 WL 5131057, at *9.

Plaintiffs provided prejudgment interest calculations up to December 31, 2019. The undersigned also calculated the daily interest rate for the determination of the interest accrued between December 31, 2019 and the date of this R&R, September 17, 2020. These calculations are set forth in the chart below.

| Payments Made to Lexington | | | |
|---|---|---|---|
| Billing Year | 2015 | 2016 | 2017 | *Grand Total* |
| Amount Paid | $17,805.06 | $67,785.57 | $3,292.78 | |
| Interest Start Date | Jan. 1, 2016 | Jan. 1, 2017 | Jan. 1, 2018 | |
| Interest End Date | Dec. 31, 2019 | Dec. 31, 2019 | Dec. 31, 2019 | |
| Annual Interest Rate | 9% | 9% | 9% | |
| Number of Years | 4 | 3 | 2 | |
| Interest through Dec. 31, 2019 | $6,409.82 | $18,302.10 | $592.70 | |
| Number of Days from Jan. 1, 2020 to Sept. 17, 2020 | 258 | 258 | 258 | |
| Daily Interest Rate | 0.0247% | 0.0247% | 0.0247% | |
| 2020 Prejudgment Interest | $1,134.65 | $4,319.70 | $209.83 | |
| Total Interest | $7,544.47 | $22,621.80 | $802.53 | *$30,968.80* |

| Payments Made to LN | | | |
|---|---|---|---|
| Billing Year | 2016 | 2017 | *Grand Total* |
| Amount Paid | $70,738.52 | $17,917.49 | |
| Interest Start Date | Jan. 1, 2017 | Jan. 1, 2018 | |
| Interest End Date | Dec. 31, 2019 | Dec. 31, 2019 | |
| Annual Interest Rate | 9% | 9% | |
| Number of Years | 3 | 2 | |
| Interest through Dec. 31, 2019 | $19,099.40 | $3,225.15 | |
| Number of Days from Jan. 1, 2020 to Sept. 17, 2020 | 258 | 258 | |
| Daily Interest Rate | 0.0247% | 0.0247% | |
| 2020 Prejudgment Interest | $4,507.88 | $1,141.81 | |
| Total Interest | $23,607.28 | $4,366.96 | *$27,974.24* |

Accordingly, the undersigned respectfully recommends prejudgment interest on the state common law claims as follow: $30,968.80 jointly and severally against Nadel and Lexington, and $27,974.24 jointly and severally against Nadel and LN. The undersigned also recommends that any

additional prejudgment interest for the period of time between September 18, 2020 and entry of judgment be calculated at the daily rate of 0.0247%.

## **CONCLUSION**

Based on the foregoing, the undersigned respectfully recommends that the Motion be granted in part and denied in part. Specifically, the undersigned recommends that the Motion be granted with respect to: (1) the RICO claims against Nadel; (2) the common law fraud claims against Nadel, Lexington, and LN; and (3) Plaintiffs' request for declaratory relief. The undersigned respectfully recommends that the unjust enrichment claims against Nadel, Lexington, and LN be denied.

The undersigned further respectfully recommends that compensatory damages be awarded in accordance with the following chart:

| Defaulting Defendant | Compensatory Damages | Trebled Damages | Total |
|---|---|---|---|
| Nadel | $177,539.42[4] | $532,618.26 | $532,618.26 |
| Lexington | $88,883.41 | N/A | $88,883.41 |
| LN | $88,656.01 | N/A | $88,656.01 |

Additionally, the undersigned respectfully recommends that prejudgment interest on the common law fraud claims be awarded as set forth in the chart below and that any future prejudgment interest be assessed at the rate of 0.0247% per day.

| Defaulting Defendant | Prejudgment Interest |
|---|---|
| Nadel | $58,943.04 |
| Lexington | $30,968.80 |
| LN | $27,974.24 |

Finally, the undersigned respectfully recommends that the Court enter a declaratory judgment that Plaintiffs are not obligated to pay the claims submitted by LN and Lexington, as indicated in Plaintiffs' Claims Chart, which remain outstanding. (Dkt. 61-7.)

---

[4] As explained above, Nadel is jointly and severally liable with Lexington for $88,883.41 in compensatory damages. He is jointly and severally liable with LN for $88,656.01.

Plaintiffs are directed to serve this Report and Recommendation on the Defaulting Defendants forthwith and file proof of service on the docket by September 23, 2020. Any objection to this Report must be filed in writing with the Clerk of Court within fourteen (14) days of service. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). Failure to timely file any such objection waives the right to appeal the District Court's Order. *See Wagner & Wagner, LLP v. Atkinson, Haskins, Nellis, Brittingham, Gladd & Carwile, P.C.*, 596 F.3d 84, 92 (2d. Cir. 2010); *Marcella v. Cap. Dist. Physicians' Health Plan, Inc.*, 293 F.3d 42, 46 (2d. Cir. 2002).

**SO ORDERED:**

*Peggy Kuo*

PEGGY KUO
United States Magistrate Judge

Dated:    Brooklyn, New York
          September 17, 2020